Appeal number 2007-3226 As counsel come and join the lecture in all of the cases today, please for the benefit of the court and for those who might be later listening to the oral argument, please enter your appearance, state your name, and who you represent clearly for the record. Good morning, Your Honor. Good morning. Neillis T. Matthews representing the petitioner in this case, Stephen William Barrere. Your Honor, I think it's appropriate to give a little bit of background on the facts. On January 8th, 2006, Mr. Barrere was demoted from his position as a senior supervisor, GS-11, to a GS-8 position as a correctional, senior correctional officer, three grades, for a comment that he had made on November 6th of 2001. And approximately six weeks in the aftermath of 9-11. Can I interrupt you for a moment just because time is limited? Let me ask you, though, about the background. I have two, a timing question. I guess two parts of a timing question. One is when the agency first told your client that it was aware that he had made these comments in 2001, and they were prepared to take, or suggested that they were taking some action. And the second timing question, because I think there's a conflict in the record as I read it, is when did your client actually lose his supervisory duties? Because the AHA said it was right away, and you suggest that it was more recent. So could you address those two timing questions? Yes, Your Honor. First, the nature of the knowledge to the petitioner happened when he received what's called a notice of proposed removal by a proposed official, and that was in October of 2005. I believe the date is October 25th of 2005. Do you know when the agency then became aware that he had made this comment? Was it right before that, or was it earlier? Actually, the comment was disclosed in an interview, I believe, Your Honor, that had occurred in March of 2004 with the Internal Affairs Office. In an interview, the tape was played, he disclosed it, he made comments about it, and nothing else was heard until October 2005. At that time, he was essentially removed from his duties and his responsibilities. When he was given a letter of proposed removal, his duty station was assigned to be at home. So from that point of view, Your Honor, he was actually removed, and then his formal removal, or his formal reduction in rank, occurred as a result of a decision on December 29th making the reduction effective on January 8th of 2006. AJ, in discussing mitigation in this case, made the comment that the fact that 5 years or 6 years had passed in the interim wasn't a compelling mitigating factor because, I'm paraphrasing here, because in 2002, he had already had his supervisory duties taken from him. Is that correct? That is not correct, Your Honor. There is nothing in the record which indicates in 2002 his supervisory duties were removed. The record does show that he was reassigned in 2005 after he had located a number of tapes that the agency had represented to the Justice Department that they had produced. In fact, they had not. And I should state to the Court that he had previously been a supervisor of the ADMAT or Administrative CHU section, and later in 2002, he was transferred to another position, but he still held his title as a senior lieutenant with the same grade and pay. But did that position include supervisory responsibility? It did not. In fact, he was working in what's called the S.I. Oh, so that's what the AJ was referring to. Yes, Your Honor. Did his switch in 2002 from one position to another, did that have anything to do, was that a disciplinary action? Did it have anything to do with those comments or anything else he did? There's no evidence in the record that it had anything to do with his comments, which were not even known at that time. Although a general investigation was going on, his movement from a supervisor in the ADMAT section to a position in the S.I.S. shop, which is a coveted position, has nothing to do with any disciplinary action at all. In fact, the record shows that the agency did not believe that he was under investigation at that time because S.I.S., which is the Special Investigation Section, investigating improper conduct of people in the prison staff, no member of that should be under investigation. So it was the agency's position that that move was not disciplinary. It was the function of the agency. He was moved to that position to perform other duties. Let me ask you then specifically, what was the date on which he ceased to perform supervisory duties? Well, that date, the specific date, Your Honor, that he was removed from the supervisory position. I'm not talking, forget the word removed. I thought you said that at some point he was transferred and in this new job he no longer had supervisory duties. The record is not clear that he did not have his supervisory duties. Oh, so it's unclear. That's correct, Your Honor. But he remained, that was in 2002, as Judge Fossett pointed out, where he occupied a position where he was not actively supervising correctional officers. He was performing a function that was commensurate with his grade, but he was not actually engaged in any act of supervising correctional officers. And that would have been in 2002 when the at-max section essentially was most of the people departed from the program. So you may not agree with it, but what the agency says that he seems to make some sense in terms of the mitigation factor. I do not agree with it, Your Honor, and I think that in a sense that he continued to be a supervisor. He performed duties that the agency believed were commensurate with the title that he held as a GS-11, although, albeit he was not directly supervising correctional officers, he had the authority and at any time could be called on in a prison environment to perform the supervisory duties in case of emergency, and he could be assigned basic shift changes to that responsibility. When you say the initial disclosure was in March of 2004, what precipitated the disclosure after the passage of three or four years? Your Honor, the Department of Justice was actively engaged in trying to determine what happened to the tapes. The deciding official and original director in this case had represented that they had produced all of the videotapes that had actually been found. Now, the record indicates that Mr. Rivera at one point knew that people in the SIS had been looking for the tapes, but that stemmed from his assignment to the SIS in 2002. He remained in that position, and in 2005, he located these tapes. He knew that the representation had been made, that all the tapes had been provided, and he informed the warden, who was the CEO of that particular institution, that, look, all the tapes that have been provided has been represented. Here are a number of tapes, and as it turned out, that was about 2,000 tapes. Where were these tapes found? Your Honor, they were found concealed, or at least no one could find them, in an area that was totally away from the immediate custody area and what's really described as kind of a warehouse. You said they were concealed. Were they hidden? That is, were they inside some sort of a box or a container, or were they just sitting on the floor or a shelf? It took a considerable search to locate the tapes. They were not apparently available from just a visual site. His testimony is he initially located some tapes, and as they delved into it more, he located more tapes. After the warden was informed, he then sent a special team from other places to look for the tapes, and it was at that time, in looking for tapes, they found that there was an additional 2,000 tapes. Was he searching for these tapes in connection with some other activity? Your Honor, it's been our position that he was not, and I think the record bears that at the time, he was basically assigned to a cleanup responsibility and a storage responsibility in kind of a warehouse environment. So part of his duties were to review the contents of this warehouse facility? Correct. He was not tasked to locate the tapes, although his testimony is that he was aware of the tapes previously as everyone else there were. Then he pressed it, and when he came across them, he recognized that, you know what? These are the tapes that have not been provided. Because I worked in that section, I recognized what they are, and that's totally improper that they haven't been produced, and I'm going to bring it to the head of the agency, which in that institution was the warden. He did not, I think it's important to point out, go to what would have been his second line supervisor, Catherine Lofesky, who later testified in support of him and informed him. What he did was to go to the warden, and he told the person that he was working with, Mr. Ward, that no, these tapes should not be here. We have to report that. Was all of the search for the tapes and looking at tapes precipitated by allegations from prisoners of mistreatment? That happened, Your Honor, in September of 2001, and then the original taping occurred in September, actually October 1 of 2001, and it was the following year, in 2002, that the OIG opened their investigation and then made a demand to the agency to produce all of the tapes. And most of the prisoners apprehended were apprehended after 9-11. That's correct. That would have been between 9-11 and about February of 2002. If you were into your rebuttal, would you like to reserve the rest of your time? I would. Thank you. Good morning, Your Honor. Tara Hogan, representing the Department of Justice. May it please the Court. Let me see if I can clarify for the Court the questions that the Court has had regarding the timeline. In 2002, the Office of the Inspector General opened an investigation into detainee abuse by staff of MDC Brooklyn. In July of 2002, OIG first interviewed Mr. Berrar and had a second interview with him in October of that year. Was that because there was an allegation directed towards him or simply because he was a supervisor at the facility? He was implicated in those allegations, and he was one of several employees who were investigated and interviewed. In December of 2003, the Office of the Inspector General issued its supplemental report. In that report on page 42 of that report, the exact statement that's at issue here was published to the public. That certainly should have been – I'm sorry. What date was that? In December of 2003, the Office of the Inspector General issued its supervisor report. That is in the Joint Appendix, although I believe that actually page 42 is not. That is a public document, and we certainly would be happy to provide a copy of that. Did his record show precisely when the agency became aware of this incident, of his comments? Well – Was it the 2-0 call? It was much earlier than 2005, Your Honor. Much earlier. As I said, Your Honor, in 2003, the Office of the Inspector General issued its report that verbatim included this comment. So in 2003, there was notice that he had made these comments. There was an addendum to the OIG report that listed names of individuals who the OIG recommended to the Bureau of Prisons that it – But that's a problem for the government, isn't it? No, Your Honor. I mean, isn't it odd that the government was aware of this, the agency, his employer, was aware of these comments three years before they took any action with respect to his responsibility? There's a very rational reason for doing that, Your Honor, and that is that the management, Bureau of Prisons management, could not take any disciplinary action until the Office of the Inspector General had completed its investigation and BOP's own Office of Internal Affairs had completed its investigation. Well, wait. So you said the Inspector General completed their report on 12-3. Right. And then what happened? Well, why couldn't they take any action? If they thought that his conduct made him unfit to be a supervisor, why did they have to let him continue to work until the Inspector General completed his investigation? What precluded them from initiating a disciplinary proceeding against him once they found out what he had done? And my understanding, Your Honor, is that it was protocol for – it was protocol to allow the investigations, which were not aimed solely at Mr. Berrar, but also covered other employees in a wide variety of alleged misconduct, let those investigations be completed, wait for the recommendations from those two agencies, and then take action. And from the record, you can see that that's precisely what the Bureau did. As I understand it, it was more than three years after this incident that they finally initiated these disciplinary proceedings. Is that right? The – yes, Your Honor. Okay. Now, I have a question. In those disciplinary proceedings, since the charge was quite old, did they make any attempt to discover whether during the couple of years or so that he continued in a supervising position, he was in effect a good supervisor or a bad supervisor, i.e., to determine whether this particular incident was just an aberration that didn't affect his skeptical performance? Did they make any attempt to examine that? Or did they just say, well, you did something bad three-plus years ago, and as far as we're concerned, you're no longer fit to be employed or ultimately no longer fit to be a supervisor? Certainly, the record reflects that Mr. O'Gara did not have any disciplinary problems after that day or anywhere else in his record. Notwithstanding that fact, the agency certainly is not precluded from taking action on a serious finding of misconduct simply because it has to wait to take that action or because it doesn't find out about that action until later. Well, if he doesn't find out, that's one thing. That's different from their knowing. I mean, the question isn't just whether they're absolutely precluded from doing it, but it does raise some questions about how seriously they took this. You said it was in the report in 1203, and then they began disciplinary action against him when? In summer 2003, the OIG report was issued. In 2004, OIA launched its own investigation, and that investigation was not completed until July 2005. That's on page 76 of your appendix. In October of 2005, he was proposed for removal, and that proposed removal was mitigated to a demotion in December of 2005. Suppose they had made the kind of inquiry I suggested, and the inquiry disclosed that after this incident, he had been an exemplary supervisor for a couple of years. I take it your position is despite such an inquiry and despite what it showed, they still would have acted within their discretion in saying what you did earlier was so bad that we think you're no longer fit to serve as a supervisor. Absolutely, Your Honor. And Mr. Dodwell, who was the deciding official, testified why he considered to be egregious conduct, why this was not the kind of comments that supervisors should be making in front of subordinates. Well, I have no problem if this incident happened, and two months later the agency went after him saying, you're no longer fit to be a supervisor like you did. But it's been more than three years, and there's no showing apparently in the record that in that interval he did anything. Now they said what he did was so horrendous. Why was it so horrendous what he did? I mean, he said some nasty things. He said it once. Why was that such a horrendous thing? Absolutely, Your Honor. Two basic reasons. First, he's a supervisor and a law enforcement officer in a prison environment. This is different from if I were or my manager were to be making statements at the water cooler at my office. This is a paramilitary organization. The chain of command is essential. And what Mr. Berard essentially said was he is advocating violence against inmates and saying that he's not going to go along with management's policies. And those simply are not statements that BOP should be required to tolerate when BOP's primary mission is to ensure the humane treatment of inmates. Even if it was a joke or if it was made out of frustration, BOP... First of all, here we have this statement that apparently came to light in 2003, and then we have the tapes that came to light, I guess, in 2005. And the tapes provide some context. One can appreciate the demeanor and the setting of the tapes that sort of bring the words on the page to reality. That's seeing, listening to those tapes, that this was just conversation. It wasn't like he was sort of making a statement that was offensive on its face. It was a commentary, along with a lot of other commentary. And typical of people sitting around a table under circumstances that might be filled with some tension, some stress, any number of other factors. Shouldn't that be taken into account? First, let me just clarify that the tape that has recorded this conversation was not the tapes that were discovered in 2005. This tape was obviously discovered prior to that because it was used in the OIG and OI investigations. So there were multiple tapes? There were thousands of tapes, Your Honor. Of the same conversation? This conversation, as far as I know, there was one tape of this conversation, and that was disclosed or identified in 2002 or 2003 because it was used by the OIG in its investigation. I see. So I'm mistaken then in thinking that the tapes that were uncovered by Mr. Barrera included the tape in question. No, Your Honor. If it was, it would have been in question. So the reporting was, everybody was aware of the reporting right from the get-go? As far as we can tell, it was certainly disclosed during the OIG investigation, when the OIG requested these tapes. So I take it that you're contending that the demeanor reflected in that tape was considered right from the very outset? Absolutely, Your Honor. And again, I want to emphasize that this is not your ordinary workplace. This is a prison environment, and this is a supervisor, and this court has held again and again that both supervisors and law enforcement officers are held to a higher standard of conduct. Certainly, a supervisory law enforcement officer should be setting an example for his subordinates, and that example includes not losing his temper and making statements which would advocate forcing a tube down an inmate's throat and saying that sensitivity training clearly was needed, that he did not intend this training to go to this training anymore. And that is what Mr. Bagel testified to in the hearing and in his prior position, that it didn't matter that apparently everyone did go to the sensitivity training or that nobody tried to force feed an inmate without the proper medical protocol, that the seed was planted for the subordinates to say, my supervisor doesn't take these rules seriously or thinks they're a joke. I shouldn't have to either. And that kind of incalculable harm to the subordinates is what was so detrimental to the agency. They should not be in a position of having to keep a supervisor like that in a supervisory role, setting an example for subordinates. It continues to be my concern, though, how that doesn't, it's not undermining the fact that it took the agency so long to take any action against him. I mean, you use terms like it was inciting violence against prisoners and so forth. It's just a troubling question. It took so long that, I mean, the agency took it, it was that serious. The agency should have taken it that seriously. If the agency took it that seriously and was aware of it in December, it's kind of odd that it took two years for them to do it. Do you agree with the other side or do you not, that even though he was in a technically a non-supervisory position, he maintained the title so that at any time he could have been called upon to be the supervisor? Right, we don't. And there was no, the agency after the report didn't put a sticker on his file or didn't put out an alert that we should not allow him to perform supervisory duties until we get this mess resolved? Right. And in fact, Mr. Dodrell testified to that, that in 2004, there had been congressional inquiries to the MDC regarding the OIG report and saying, why are you keeping these employees and their positions where they're in contact with inmates? And as a result of that, Mr. Dodrell did ask for the warden to move Mr. Berrar to the SIS shop where he would be more closely supervised by, where there would be other witnesses essentially. And so they did that when? He was moved to the SIS shop in 2000, May of 2004. I thought the other stuff was saying that move took place in 2002. He may have been moved around. The lieutenants do quarterly changes, so it would have been normal for him to move from different position to different position. Certainly in May of 2004, he was assigned to the SIS. And that's at page 2000 and 2002. That's Mr. Berrar's affidavit. And actually, that document should answer most of the court's questions about his whistleblowing claim because in that affidavit, he clearly says he did not know the contents of those tapes. Do you disagree with your opponent that after 2002, when he was moved to another job, he no longer was performing supervisory duties? He still had the title and the pay of the job, but was he acting as a supervisor or something else? It's not clear from the record, Your Honor, that he may have been supervising some assistants in the SIS shop. But there's not any clear evidence in the record that he was still in a correctional supervisory position. If the court has no other questions, we would respectfully request that the court affirm the judgment of M.C. Thank you very much. Mr. Rasmus? Yes, Your Honor. I have a few points that I want to focus on. One, we've heard the Justice Department explain that this is such a serious, abusive statement. And I would point out to the court in the record that Mr. Doddrell, and for another supervisor who admittedly was accused of mistreating an inmate by pushing his face into what he described as a bloody T-shirt, he only gave that supervisor a four-day suspension. And he testified in his testimony that in his judgment he doesn't differentiate between a GS-9 or a GS-11 supervisor for purposes of punishment. So if the agency is arguing that this 10-second statement made in 2001 was so egregious because it was made by a supervisor with respect to the actions that were taken by Mr. Doddrell as the deciding official, he gave a four-day suspension for someone who the OIG found was actively abusing inmates physically and who the findings were that he abused this inmate. In this case, we don't have that. I would also point out that with respect to his tenure in the SIS shop, that he wasn't transferred there as a result of the investigation. In fact, the record shows at Volume 1, Page 278, when Captain Lepreski was asked with respect to what had occurred about his duties in the SIS shop, he was asked would it be unusual for someone working within the SIS, the SIS shop, to be the subject of investigation himself. And he said that would be highly unusual. So I would point out that at the time he was working in the SIS shop, he was not the subject of investigation. The movement which counsel refers to when Mr. Doddrell received word or a concern by Congress members happened after the action that he took against Mr. Barrera happened after Mr. Barrera located the tapes. He then immediately moved him to a different location in 2005. And we asked him, why did you move Mr. Barrera in 2005 after he found the tapes? And his response is that while he was getting a pressure to do that, and he decided with a number of people, including Mr. Barrera, to put them in non-public positions. It's the wording that he used. Positions where they would not be exposed to the public and then would not be exposed to inmates. And I would submit that that reassignment of the responsibility happened in retaliation for the tapes, not for any other reason. There's one other point that I wanted to point out in that the agency has put quite a bit of focus on the fact of violence and you can't tolerate this from supervisors. I would point out that the deciding official actually sustained a three-grade demotion based upon three different charges. Two of which involved direct treatment of the inmates. One in which he was accused of actively mistreating the inmates. And the other in which he was accused of not being candid in the investigation. Those two charges were dropped. And although the deciding official testified at the hearing in response to a question that he had given on the oath in the deposition, that after this one charge he would only have reduced him to a GS-9 position, in the hearing he then changed his position and said, I would have reduced him for that position alone. And I would submit that that was just simply not a candid response on his part in light of his previous testimony. Thank you. Thank you. Counsel, the case is submitted.